## NAVAL GOVERNMENT OF GUAM v. 11,-825,263 SQUARE METERS OF LAND, ETC., IN MUNICIPALITY OF BARRIGADA, ISLAND OF GUAM, et al.

## CEPEDA v. BROWN–PACIFIC–MAXON CO. et al.

Civ. Nos. 34–50, 17–51.

District Court of Guam.

Feb. 13, 1952.

James G. Mackey, U. S. Atty., Hollis Atkinson, Sp. Atty., Lands Division Department of Justice, Agana, Guam, for Government.

James C. O'Connor, Agana, Guam, for defendant.

SHRIVER, Judge.

Properly to understand the legal problems presented by the above cases requires some knowledge of the economic conditions existing in Guam at the present time and the drastic changes which resulted from the war, the Japanese occupation, and the re-occupation by the American armed forces. Involved in these economic conditions is the traditional culture and way of life of the Guamanians who are now affected by these and similar actions.

Prior to the war the economy of Guam was primarily an agrarian economy where many people had farmed the same land as their ancestors had done before them for generations. Land was available for purchase at small cost in terms of present prices. There were few modern roads and few automobiles. When Guam was retaken by our forces the process of major development began. Land was occupied as needed for military purposes. Roads were constructed and improvements made without reference to existing property lines. Most buildings had been destroyed and most of the people were left without homes. In short Guam suffered a very high degree of destruction and displacement of the indigenous population.

After the Naval Government of Guam was re-established the long process began of attemping to straighten out land titles and pay compensation for occupancy. The needs of the armed services increased due to the post war importance of Guam as a defense base. Large construction projects were begun. Thousands of workers were brought in and the resulting impact of these combined expenditures was to change

the economy of Guam from primarily an agrarian economy to a business and service economy.

In dealing with the problems of land acquisition, the Naval Government established its own court, known as the Superior Court in which it filed condemnation proceedings. The extent of these takings is indicated in Executive Order No. 10178, Oct. 31, 1950, F.R. 7313; 48 U.S.C.A. § 1422b note.

An excellent analysis of the land situation as it existed at the time of these fee simple takings is found in the report of Robert K. Coote, Bureau of Land Management, U. S. Department of Interior, August, 1950, entitled "Land Use Conditions and Land Problems on Guam."

When the District Court of Guam was established, these condemnation cases were removed to this court by the United States Government.

During the transition period while the armed services were determining the extent of their permanent needs, leasehold interests for a period of one year, renewed from year to year, were condemned. Except where the land was needed for use or security problems were involved it was the practice of the government to permit the owners to continue to occupy the land under what was known as a "revocable permit." This system created few problems as to value since the owner continued in possession and the government was not faced with the possibility of having expensive improvements made by owners upon land which it might subsequently condemn in fee simple.

As, however, it became necessary for the government to condemn land in fee simple, the land owners not affected by the condemnation actions held their land off the market in anticipation of greater prices or the basic unwillingness to part with land. The numbers of sales are very limited. In fact the evidence in this case showed that there are no business people in Guam who are active full time real estate brokers. The problem of land value is further complicated by the fact that during the period in question here there were no land taxes imposed by the government so that those who held their land were not required to pay land taxes.

The net result of this situation is that those whose land is taken cannot in general purchase similar land at prices approximating the values placed on their land by the government appraisers. This condition has led to a distorted sense of land values with possible sellers valuing their lands at many times the ordinary use value while much land lies idle and unfarmed for lack of labor. The ordinary economic forces which establish fair market values are not at work.

I am therefore confronted with the necessity of attempting to arrive at a fair value or just compensation for the land in question here. The problem would not be too great if the same facilities were available to the defendants as to the government but this is a new and strange situation to the Guamanians, having to give up their land, and they are bewildered by their desire as new and patriotic American citizens to yield to the wishes of their government on the one hand and their views as to the value of the land taken from them on the other. The government has at its disposal the same legal mechanism, including highly qualified expert witnesses, as it might have in a stateside community but the defendants do not have access to similar experts who could only be obtained at prohibitive cost to them. It devolves upon the government and the court, therefore, to make doubly sure that the interests of the former land owners are protected. In the trial of this first of many cases I allowed the government and the defendant considerably more leeway in presenting concepts of value than would ordinarily be allowed.

While I conclude that the appraised value placed upon this property by the government provides just compensation, I hold no illusions that this defendant or others similarly affected could at the time of taking or now be able to purchase comparable land for the amounts allowed or for some time to come, if ever. The limited number of sales of land represent sales in part to relatives or close friends, except for high

prices which may be paid by purchasers who are willing to pay such prices because of the value of the particular land for particular purposes.

In June, 1949, the government had possession of Cepeda's land under a leasehold interest which it had condemned. Joint use occupancy was returned to Cepeda under a revocable permit. Top soil from part of the land was removed and in December, 1949 Cepeda began an action against Brown-Pacific-Maxon for the value of the top soil in the Island Court. As the United States was primarily the defendant the action was transferred to the District Court of Guam. The fee simple title to the land was condemned on June 30, 1950. Brown-Pacific-Maxon was a government contractor operating under a cost, plus fixed fee contract. At the pre-trial conference the government admitted that the top soil had been taken by its agents or employees for its use but denied that it had been taken by Brown-Pacific-Maxon. I consolidated the alleged trespass action with the condemnation action in view of my concept as to the applicable law. At the trial of the condemnation action it developed that the value of the land at the time of the fee simple taking was based on its value with the top soil in place.

I believe that the applicable law in these circumstances is set forth in the first sentence of 15 Am.Jur. 120: "It has frequently been held that where earth, sand or gravel is wrongfully removed from land, the owner may recover the difference between the value of the land immediately before the removal and its value immediately thereafter."

The case of Carr v. United States, D.C., 28 F.Supp. 236 is cited as an example of the test I have applied. If the government pays for the whole it would not appear that the land owner has suffered a legal injury for damage to the part. The case of Cepeda v. Brown-Pacific-Maxon and the United States is for dismissal.

The government attempted to inject into the trial of the condemnation action the concept that I should deduct from any allowance to Cepeda any amounts which had been paid to Cepeda for leasehold rentals or if not paid hold that no amounts are due him for that period during which he was allegedly in possession under the revocable permit. It is my impression the counsel for the government were not in agreement on this point. The question was not raised prior to trial and I am certainly not prepared to hold that the government can escape its responsibility to pay the reasonable rental value of the land during the leasehold years simply on the basis of the revocable permits which gave the owner only a limited right to use his land. I do not pass upon this question in the instant case.

The Cepeda land consists of 8.139 hectares, known as Lot 2200 Barrigada. It is agricultural land which fronts on a hard surfaced road. The front portion is suitable for residential use. It is agreed that insofar as possible its value should be based upon its fair market value at the time of the taking, June 30, 1950. The government introduced evidence as to sales of land in that general area before the war and after the war indicating an average cost of $49 per hectare. In evaluating the Cepeda land the government appraiser took into consideration its value for agricultural purposes, plus the increased value of the road frontage for possible residential use and the undoubted increased value of the Cepeda land in terms of a normal, although hypothetical, market on June 30, 1950. He arrived at an average value of $250 per hectare as of June 30, 1950.

The defendant Cepeda testified that he and his neighbors considered their land worth $3000 per hectare and introduced evidence of one witness who had purchased land of somewhat greater value around 1948 from his father-in-law for $2300 consisting of 2½ hectares. He testified that his father-in-law would not have sold the land then except to a member of the family.

In these circumstances I hold that the values established by the government represent just compensation within the meaning of the Fifth Amendment to the Constitution. To hold otherwise would be further to distort land values on this small island.

430

■ There was a partially destroyed building on the land which had an appraised value of $750 when the government first took possession under its leasehold condemnation. Cepeda leased this building as a residence and improvements were made by the using tenants until it had an appraised value of $2500 on June 30, 1950. Under the terms of the revocable permit the permittee was allowed to make improvements and to remove the same without cost to the permittor when directed to do so by the permittor. The improvements were made to a concrete base structure as differentiated from the type of building which could be moved in its entirety. Without going into the question of the validity of the revocable permit as a whole I think it is clear that the obligation of the government is to pay for the structure before improvements in the amount of $750.

Counsel for the government shall prepare Findings of Fact and Conclusions of Law with appropriate judgment and settle with counsel for Cepeda within 30 days.